T.C. Summary Opinion 2006-161

UNITED STATES TAX COURT

JUDITH A. SANDERS-CASTRO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6319-05S.                    Filed October 4, 2006.

Judith A. Sanders-Castro, pro se.

<u>Roberta L. Shumway</u>, for respondent.


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

_____

[1] Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for 2001, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 2001 in the amount of $14,490, as well as additions to tax for that same year, as follows: $2,189.25 under section 6651(a)(1), $1,508.15 under section 6651(a)(2), and $364.12 under section 6654(a).

After concessions by respondent, the two issues for decision are: (1) Whether petitioner's horse showing and breeding activities were activities engaged in for profit within the meaning of section 183; and (2) whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to timely file her 2001 Federal income tax return. We hold that petitioner's horse showing and breeding activities were not engaged in for profit within the meaning of section 183 and that she is liable for the addition to tax under section 6651(a)(1).

## Background

Some of the facts have been stipulated, and they are so found. We incorporate by reference the parties' stipulation of facts and accompanying exhibits.[2]

At the time the petition was filed, Judith Sanders-Castro (petitioner) resided in San Antonio, Texas.

---

[2] As she did not file a pretrial memorandum, at trial petitioner specifically requested the opportunity to provide the Court with a written reply to respondent's submission. Consequently, both parties were ordered to submit posttrial memoranda within 90 days. Respondent's posttrial memorandum was filed June 1, 2006; petitioner's brief was never received.

Petitioner is currently employed as an attorney by Texas RioGrande Legal Aid, Inc. In 2001, petitioner worked part time at Texas Rural and Legal Aid and performed contract work for another attorney. She had both wage income and Schedule C, Profit or Loss From Business, income from her work as an attorney. Petitioner's husband is a social worker.

Neither petitioner nor her husband rides horses. Petitioner was introduced to horse showing and breeding activities by her long-time friend Cindy Pruitt (Ms. Pruitt), who also raised horses in her spare time. Petitioner studied Ms. Pruitt's operations for over a year and began accompanying her to horse shows; petitioner herself joined the Appaloosa Horse Club in 1998. Fascinated with Appaloosas because of their beauty and her enchantment with their history in Native American lore, petitioner's own horse showing and breeding activities began in 1998 when she purchased her first horse, a 2-year-old Appaloosa stallion named Skips Jrs. Shado (Skippy), from Ms. Pruitt for $2,000. Skippy got sick and died in 1999.

A few months after she purchased Skippy, petitioner purchased a mare named Sarah Air for $4,700. The mare was pregnant at the time of the purchase and, a few weeks later, foaled King Shados Air (King).[3] Petitioner sold King for $5,300

---

[3] Although petitioner purchased the mare in May 1998, she did not take official ownership of the horse or her foal until
(continued...)

in 2000 and did not report any gain as income on her Schedule C for that year.

Petitioner bred Sarah Air with Jr's Shado, the same stallion that produced Skippy and King. Jr's Shado was owned by T.L. Seville (Mr. Seville).

Sarah Air foaled Saras Chula Shado (Chula) in May 1999. Petitioner bred Sarah Air another time with Jr's Shado, unsuccessfully, in 1999. Breeding the same pair still another time yielded a horse named Star in 2001. Chula was sold in 2002 in exchange for $1,250 and training for Star valued at $1,000. Both Star and Sarah Air were later given away to a friend for free.[4]

In 1999, petitioner purchased another mare, Flash, discovered by Ms. Pruitt at a rodeo. The idea was that petitioner would buy Flash and pay for training while Ms. Pruitt would maintain the horse, and the two would split the profits from Flash's eventual sale.[5] Petitioner purchased Flash for $3,600, had her trained for about 6 months (at a cost of

---

[3](...continued)
Jan. 23, 1999.

[4] Petitioner testified that, at the time of trial, the transfer of the horses was not yet complete but that she was incurring no further related expenses and that her friend had "assumed ownership" of the horses.

[5] Despite this 50-percent partnership arrangement, petitioner claimed 100 percent of the depreciation deductions for this horse on her 1999 and 2001 tax returns.

approximately $3,600), and ultimately gave her away at no charge to a friend in 2004.

Petitioner hired people she considered to be experts to care for and train the horses. Most of the horses were boarded with Ms. Pruitt in Texas or with Mr. Seville in Colorado or New Mexico. Petitioner paid Ms. Pruitt, Mr. Seville, and others to train and show the horses.

Part of building a horse's reputation--and thus its appreciation in value--results from its performance at horse shows. For example, Sarah Air won numerous riding competitions during the time petitioner owned her. The shows in which petitioner entered her horses did not pay prize money. Rather, the horses would win points for placing in various categories. None of petitioner's horses were entered in any competitions in 2001.

Petitioner listed her horse showing and breeding activities on her Federal income tax returns with the fictitious business name "Autumn Skies Ranch", but she never filed a name registration for that business. She never made business cards or letterhead. She did not regularly issue Forms 1099 (information returns) to the professionals she paid to board or train her horses. She did not regularly enter into written contracts concerning the care, training, or showing of her horses.

Petitioner did not keep a separate bank account for her horse showing and breeding activities, but she testified that she maintained a spreadsheet with information on each horse and its expenses.[6] She did not do any bookkeeping for the activities because she felt that, with relatively few horses, she would be able to track her expenses accurately. No income was reported from the horse showing and breeding activities through the taxable year 2001.[7]

Petitioner did not advertise her horses for sale in trade magazines or journals at any point in her operations. Petitioner ceased her horse activities in November 2005.

At the time the notice of deficiency was issued, petitioner had not yet filed a Federal income tax return for 2001. Based on a substitute for return prepared pursuant to section 6020(b), respondent determined a $14,490 deficiency in tax, along with additions to tax totaling $4,061.52, for 2001.

Petitioner filed her petition with the Court on April 1, 2005. On April 6, 2005, petitioner and her husband jointly filed a Form 1040, U.S. Individual Income Tax Return, for the 2001 taxable year with the Internal Revenue Service.

---

[6] The spreadsheet was not introduced as an exhibit.

[7] Petitioner has yet to file returns for subsequent years, but she testified to the fact that the activities were never profitable.

After concessions by respondent, only two issues remained at trial. The first issue was whether petitioner operated her horse showing and breeding activities with the objective of making a profit. The second issue was whether the addition to tax under section 6651(a)(1) is appropriate. We discuss both issues in detail below.

Discussion

## 1. Horse Showing and Breeding Activities

Section 183 specifically precludes deductions for activities not engaged in for profit except to the extent of the gross income derived from such activities. Sec. 183(a) and (b)(2). Deductions are not allowable for activities that a taxpayer carries on primarily for sport, as a hobby, or for recreation. Sec. 1.183-2(a), Income Tax Regs. For a taxpayer's expenses in an activity to be deductible under section 162, Trade or Business Expenses, or section 212, Expenses for Production of Income, and not subject to the limitations of section 183, a taxpayer must show that the taxpayer engaged in the activity with an actual and honest objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Hastings v. Commissioner, T.C. Memo. 2002-310. Although a reasonable expectation of a profit is not required, the taxpayer's profit objective must be actual and honest. Dreicer

v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs. Whether a taxpayer has an actual and honest profit objective is a question of fact to be answered from all the relevant facts and circumstances. Hulter v. Commissioner, supra at 393; Hastings v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs. The taxpayer bears the burden of establishing he or she had the requisite profit objective.[8] Rule 142(a); Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Hastings v. Commissioner, supra.

The regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit objective exists. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in

---

[8] Generally, and aside from sec. 183-related issues, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving those determinations wrong. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under sec. 7491, the burden of proof may shift from the taxpayer to the Commissioner if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's tax liability. Sec. 7491(a)(1). In this case there is no such shift because petitioner neither alleged that sec. 7491 was applicable nor established that she fully complied with the requirements of sec. 7491(a)(2). The burden of proof remains on petitioner. Compare sec. 183(d), which is inapplicable to the instant case because its conditions have not been satisfied.

carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. See sec. 1.183-2(b), Income Tax Regs.

No single factor, nor even the existence of a majority of factors favoring or disfavoring the existence of a profit objective, is controlling. See id. Rather, the relevant facts and circumstances of the case are determinative. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Although there are facts that favor petitioner, on the basis of all of the facts and circumstances in the present case, we must find that petitioner was not engaged in her horse showing and breeding activities for profit within the meaning of section 183. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).

We do not analyze in depth all nine of the factors enumerated in the regulation but rather focus on some of the more important ones that lead to our decision.

A.  Complete and Accurate Books and Records

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.  Here, the balance of the facts supports respondent's contentions.

Petitioner commingled funds from her horse showing and breeding activities with her personal finances.  While not determinative, commingling funds can be one indication that an activity is engaged in as a hobby and not for profit.  See Ballich v. Commissioner, T.C. Memo. 1978-497.

Additionally, petitioner, an attorney, did not have any written contracts with the professionals she hired to care for, train, and show her horses.

Petitioner failed to keep any specific books and records with respect to the horse activities' profitability and management, and any records she did maintain were poorly organized and inaccurate.[9]

Petitioner failed to develop a budget or a business plan. While budgets and business plans are not required, a lack of information upon which to make educated business decisions tends to belie a taxpayer's contentions that an activity was pursued

---

[9]  Although petitioner did not accurately track and report her expenses for the horse showing and breeding activities, substantiation was not raised as an issue in this case.

with the objective of making a profit. <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89, affd. without published opinion 188 F.3d 507 (6th Cir. 1999).

Inasmuch as petitioner was a sufficiently competent professional in other areas, her lack of businesslike treatment of these activities weighs against a finding that petitioner had the requisite profit objective.

B.  <u>Petitioner's Research Into the Activity</u>

A taxpayer's expertise, research, and study of an activity, as well as his or her consultation with experts, may be indicative of a profit objective.  Sec. 1.183-2(b)(2), Income Tax Regs.  Petitioner sought general advice from the few breeders and trainers she knew and with whom she was already friendly.  She attended shows and read trade literature.  There is no evidence however, that petitioner reviewed the records of other breeding operations or that she sought specific advice as to how to make her own operation profitable.  Petitioner had no idea how saturated the horse-breeding market may have been before entering it.  She chose Appaloosas because of their beauty and not because they represented a good business investment.  Petitioner used only a single stallion to breed with her mare, and the stallion required live insemination visits to be successful; there is no indication that any research was done to determine the cost-effectiveness of this arrangement.  This factor also weighs

against a finding that petitioner had the requisite profit objective.

   C.  Losses From the Activity

   A taxpayer's history of income or losses with respect to the activity can indicate whether a profit objective was present. Sec. 1.183-2(b)(6), Income Tax Regs.  Petitioner estimated at trial that she incurred approximately $8,300 in expenses related to the horse showing and breeding activities that she did not deduct on her Federal income tax return for a previous taxable year.  Without taking those expenses into account, petitioner has claimed $43,289--all as losses--in deductions from the commencement of these activities in 1998 through the taxable year in issue.  In petitioner's favor is the fact that she ceased involvement with the activity in 2005.

   Horse breeding is an activity subject to unforeseen risks, such as the premature death of a horse.  In addition, petitioner could have been considered to be in a startup phase as 2001 represented only her fourth year of participation in an activity with a long investment period.  While cases have held that horse-breeding activities may be engaged in for profit despite consistent losses during the startup phase, see Golanty v. Commissioner, supra at 427, it is not merely the absolute loss that the Court must consider.  Rather, it is the overall record, and most notably the fact that the one time petitioner realized

any gain from the sale of a horse, she neglected to include it on her Schedule C for the applicable year. The Court finds that this factor weighs against the existence of a profit objective.

D. Profit From the Activity

Some profit, even if only occasional, may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs. Absent actual profits, the opportunity to earn substantial profits in a highly speculative venture may be sufficient to indicate that an activity is engaged in for profit. See id. Petitioner never put herself in a position to earn a profit in the year at issue. She did not enter her horses in competitions that paid cash prizes, but only in those that awarded points. None of her horses were entered into any competitions during the taxable year. She never advertised any of her horses for sale. While petitioner could have recouped some of her losses through the sale of her horses (one of which was a successful brood mare with a proven record of performance in competition) at the time she ended her participation in the activity, she chose not to. She chose instead to give the horses away to a friend. Petitioner testified that the market for horses was down and that she would not have been able to fetch a good price for her horses; if a profit objective had been at the heart of her participation in this activity, petitioner should

have been willing to offset her losses by some amount when she ceased participation, even if overall she never made a profit.

### E. Petitioner's Financial Status

The fact that the taxpayer has substantial income from sources other than the activity in question, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. During the taxable year 2001, petitioner reported wage income of $89,831 and a Schedule C gain of $5,893 from her part-time job performing contract work for another attorney. During the same year, petitioner reported Schedule C losses from the horse showing and breeding activities of $13,128. Without the other income, petitioner's family could not have successfully sustained losses of approximately 13 percent of their household income.

Considering all the facts and circumstances, we find that petitioner's horse showing and breeding activities were not engaged in for profit within the meaning of section 183(c). Respondent's determination of an income tax deficiency is therefore sustained.

### 2. Addition to Tax

Section 6651(a)(1) imposes an addition to tax for failure to file a return by its due date. The addition equals 5 percent for each month or fraction thereof that the return is late, not to

exceed 25 percent.  <u>Id.</u>  Respondent bears the burden of production with respect to the addition to tax.  See sec. 7491(c); see also, e.g., <u>Swain v. Commissioner</u>, 118 T.C. 358, 363 (2002); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). Respondent has met his burden.

The last date for petitioner to file her taxable year 2001 return was April 15, 2002.  Sec. 6072(a).  Petitioner's 2001 return was not filed, however, until April 6, 2005, almost 3 years past its statutory due date and 5 days after the petition in this case was filed.  The return was clearly late.

"A failure to file a tax return on the date prescribed leads to a mandatory penalty unless the taxpayer shows that such failure was due to reasonable cause and not due to willful neglect."  <u>McMahan v. Commissioner</u>, 114 F.3d 366, 368 (2d Cir. 1997), affg. T.C. Memo. 1995-547.  The taxpayer bears "the heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause'", in order to escape the penalty.  <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985).  "Willful neglect" denotes "a conscious, intentional failure or reckless indifference."  <u>Id.</u>  Petitioner did not establish that her failure to timely file was due to reasonable cause and not to willful neglect.

Petitioner argued that extenuating circumstances caused her to be late in filing her tax return for the taxable year at issue. She argued that her part-time employer was very demanding and that she had tremendous difficulties at home. She further testified that 2002 was a terrible year for her family.

A taxpayer may have reasonable cause for failure to timely file a return where the taxpayer or a member of the taxpayer's family experiences an illness or incapacity that prevents the taxpayer from filing his or her return. See, e.g., Hobson v. Commissioner, T.C. Memo. 1996-272; Tabbi v. Commissioner, T.C. Memo. 1995-463. Petitioner and her husband both managed to hold down professional jobs during the relevant time period; petitioner herself also managed to engage in part-time work, participate in her horse showing and breeding activities, and care for her family around the time this return was due and for some time thereafter. This would indicate that she could have filed the return on time had she chosen to do so. See Watts v. Commissioner, T.C. Memo. 1999-416; Wright v. Commissioner, T.C. Memo. 1998-224, affd. without published opinion 173 F.3d 848 (2d Cir. 1999).

Further, the vast majority of the tragic events to which petitioner refers occurred after the April 15, 2002 filing deadline. Although the Court greatly sympathizes with petitioner and her family for their difficulties, petitioner provided no

information demonstrating the extent to which her family's difficulties prevented her from filing the 2001 return at some point before being "pounced upon" by the IRS.[10]

On the basis of the record before us, we therefore conclude that petitioner did not demonstrate that her failure to timely file a return was due to reasonable cause and not willful neglect.  See sec. 301.6651-1(c), Proced. & Admin. Regs.; sec. 1.6161-1(b), Income Tax Regs.  Accordingly, petitioner is liable for the addition to tax under section 6651(a)(1) for 2001.

### Conclusion

After considering all of the facts and circumstances, we hold that petitioner's horse showing and breeding activities were not engaged in for profit within the meaning of section 183 and that she is also liable for the addition to tax under section 6651(a)(1) for her failure to timely file her 2001 tax return.

Reviewed and adopted as the report of the Small Tax Case Division.

---

[10]  Given the stipulations in this case, a pattern emerges. Petitioner did not file her Federal income tax return for the taxable year 1999 until Sept. 17, 2001, well beyond the statutory deadline of Apr. 15, 2000.  See sec. 6072.  Petitioner did not file her Federal income tax return for the 2000 taxable year until Oct. 11, 2001.  At the time of trial, and despite having an accountant with whom she regularly consulted, petitioner had not yet filed her Federal income tax returns for taxable years 2002, 2003, 2004, and 2005.

To reflect our disposition of the disputed issues, as well as respondent's concessions,

Decision will be entered for respondent for a deficiency of $4,395 and an addition to tax under section 6651(a)(1) of $988.65, and decision will be entered for petitioner for the additions to tax under sections 6651(a)(2) and 6654(a).